***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Ronnie E. Rowell, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 6 June 2001 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. It is stipulated that all parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and the subject matter.
3. It is stipulated that all parties have been correctly designated, and that there is no question as to misjoinder or nonjoinder of parties.
4. The defendant-employer is insured by American Home Assurance Company who is named as the defendant-carrier herein.
5. At the time of plaintiff's alleged injury, the plaintiff was employed with the defendant-employer as a "slotter" and earned $12.10 per hour.
6. The plaintiff is currently employed as an office assistant with Food Lion located at 150 Andrews Road in Fayetteville, North Carolina and has been employed in that capacity since November 19, 2000. She reports to earn $8.05 per hour.
7. That the defendant-employer denied the plaintiff's claim. The plaintiff went on leave of absence effective March 28, 2000.
8. Plaintiff last worked for defendant-employer on or about March 28, 2000.
9. The parties stipulated into evidence as Stipulated Exhibit #1, the Pre-trial Agreement.
10. The parties stipulated into evidence as Stipulated Exhibit #2, a packet of plaintiff's medical records.
11. The parties stipulated into evidence as Stipulated Exhibit #3, an I.C. Form 22.
12. The parties stipulated into evidence as Stipulated Exhibit #4, a videotape of the slotter job position.
13. The parties stipulated into evidence as Stipulated Exhibit #5, an ergonomic task analysis.
14. The parties stipulated into evidence as Stipulated Exhibit #6, an I.C. Form 33, filed with the Industrial Commission on September 28, 2000.
15. The parties stipulated into evidence as Stipulated Exhibit #7, an I.C. Form 33R, filed with the Industrial Commission on December 4, 2000.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty-eight year-old right hand dominant female, who had graduated from high school. Plaintiff had also received some community college training in computers and in loan processing. On March 19, 1999, plaintiff became employed with defendant-employer as a slotter. As a slotter, plaintiff's duties consisted, among other things, of basically counting and verification of merchandise, some use of computer and hand-held scanner, and writing certain information on tags. A slotter would write on each tag using up to ten characters and was required production of thirty-two tags per hour, or 320 tags per shift. Plaintiff worked as a slotter for defendant-employer for ten hours per day, four days per week. There is no evidence that plaintiff ever had any difficulty making this production requirement. During a ten-hour shift, a slotter is given a fifteen-minute break, a thirty-minute lunch, and a twenty-minute break. In the performance of duties as a slotter most of the time that an employee spends is dedicated to the verification process, which involves observing and counting. The duties of a slotter does not require an employee to do constant writing, it only requires an employee to jot down what comes out of the computer.
2. On March 9, 2000, plaintiff stated that she left work and had pain and due to her pain she could not sleep. Plaintiff stated that the next morning, which would have been on March 10, 2000, she called her physician, Dr. James Livingston, and went in to be seen. Plaintiff was actually seen by Dr. Livingston on March 9, 2000. Plaintiff presented to Dr. Livingston with complaints of pain, soreness, and tenderness in her right arm and wrist. Plaintiff indicated to Dr. Livingston that from time to time over the last couple of weeks she had noticed a shooting pain from her wrist upward when doing usual activities such as writing, driving an automobile, and sleeping. Plaintiff indicated to Dr. Livingston that she also felt this pain while performing her duties at work using her hand while writing. Dr. Livingston prescribed some medication for plaintiff, that she wear a cock-up sprint, and to rest the next day and over the weekend. Plaintiff took her next day of work off taking a sick day.
3. On plaintiff's next day at work after her March 9, 2000 visit with Dr. Livingston, she reported to Darryl Shaw about her visit to Dr. Livingston and the problems she had been having. About a week after reporting to Darryl Shaw plaintiff also reported to Bryan Mayes about the problems she was having, both Shaw and Mayes worked for defendant-employer. Plaintiff reported to both Shaw and Mayes that she did not know if the problems she was having were work-related.
4. Following plaintiff's initial visit with Dr. Livingston on March 9, 2000, plaintiff was treated by Dr. Livingston on the following dates: March 23, 2000, March 31, 2000, April 14, 2000, May 1, 2000, and July 26, 2000. On March 23, 2000, plaintiff presented to Dr. Livingston with some complaints of shooting pain and indicated that due to this pain she has had some difficulty doing her job at work. On March 23, 2000 Dr. Livingston wrote plaintiff a note for light duty work and no repetitive work for two weeks. Dr. Livingston referred plaintiff to Dr. Louis P. Clark, an orthopaedic hand and wrist specialist, for evaluation to determine if plaintiff had carpal tunnel syndrome.
5. Plaintiff presented Dr. Livingston's March 23, 2000 note to defendant-employer, and plaintiff was sent for an evaluation to Dr. Bruce W. Brown, with Cape Fear Valley Health System. Plaintiff was seen by Dr. Brown for one visit on March 24, 2000. Dr. Brown noted that plaintiff was able to return to work on March 24, 2000 with limited use of her right hand, and with frequent short breaks.
6. On March 31, 2000, plaintiff was seen by Dr. Livingston and he noted that plaintiff was in the process of trying to make arrangements at work for time to get her problem resolved. Dr. Livingston on March 31, 2000 also noted that his feeling was that plaintiff's problem was probably associated with the constant use of her hands in her work duties. Dr. Livingston also felt that plaintiff may benefit from having some rest. Dr. Livingston further noted on March 31, 2000 that he would wait and see what the surgeon wanted to do with her definitive management of this problem. On March 31, 2000, Dr. Livingston certified on plaintiff's request for leave of absence form with defendant-employer that plaintiff was under his care for carpal tunnel syndrome, and that this was not a workers' compensation leave of absence. Based upon this leave of absence request and verification, plaintiff began her leave of absence with defendant-employer on March 28, 2000.
7. Plaintiff was referred by Dr. Livingston to be evaluated for possible carpal tunnel syndrome by Dr. Clark, of Cape Fear Orthopaedic Clinic. Plaintiff was seen by Dr. Clark on March 30, 2000 and on April 13, 2000. On March 30, 2000, Dr. Clark scheduled electrical studies to be performed on plaintiff with Dr. Tran on March 31, 2000. On April 13, 2000, Dr. Clark noted that plaintiff's electrical studies show that she did not have carpal tunnel. Dr. Clark also noted that plaintiff's problem had been only going on for about a month and that he did not find anything disturbing from a surgical aspect. Dr. Clark further noted that he did think plaintiff needed a neurological evaluation. Plaintiff did not return to see Dr. Clark after her April 13, 2000 evaluation.
8. On April 14, 2000, plaintiff was seen by Dr. Livingston. on April 14, 2000, Dr. Livingston noted that since plaintiff's carpel tunnel syndrome had been ruled out he felt that plaintiff's pain most likely was tendonitis. On April 14, 2000, Dr. Livingston made a referral for plaintiff to be seen by a rheumatologist. On May 1, 2000, plaintiff presented to Dr. Livingston for a re-check on her right wrist tendonitis and pain, and also presented with having some discomfort and pain in her neck as well. On May 1, 2000, Dr. Livingston's assessment of plaintiff was that of tendonitis and arthritis pain in her right wrist as well as some tendonitis in her neck area with muscle spasm. Dr. Livingston further noted that plaintiff was scheduled to see a rheumatologist on May 9, 2000.
9. On May 9, 2000, plaintiff was seen by Dr. Maria J. Watson, a rheumatologist, with Lafayette Clinic in Fayetteville, North Carolina. Plaintiff was referred to Dr. Watson for evaluation by Dr. Livingston. On May 9, 2000, Dr. Watson noted that she suspected that plaintiff's right hand problem is secondary to repetitive motion. On May 9, 2000, Dr. Watson told plaintiff to limit her activity and to return to see her in four to six weeks. On June 6, 2000, plaintiff was seen by Dr. Watson for a follow-up visit and reported that her forearm was still bothering her. On June 6, 2000, Dr. Watson's examination of plaintiff's right hand, forearm, and wrist revealed normal joints, no swelling, and full strength in both of plaintiff's upper extremities. On June 6, 2000, Dr. Watson further noted that it is still not clear to her what is going on with plaintiff, however, he thought she may have had overuse syndrome from her job. On June 27, 2000, plaintiff was seen by Dr. Watson for a follow-up and she reported she still has some pain in the right wrist. Dr. Watson's June 27, 2000 examination of plaintiff revealed that she has full strength of the right hand. On July 25, 2000, plaintiff was seen for a follow-up visit by Dr. Watson for her tendonitis and right wrist pain. Dr. Watson's diagnosis of plaintiff was DeQuervain's tendonitis, right wrist pain, and right elbow tendonitis. On July 25, 2000, Dr. Watson further noted that she agreed with plaintiff that she was not going to be able to return to her old job. On July 25, 2000, Dr. Watson gave plaintiff work restrictions that she was not able to do repetitive motion with the right hand and wrist, and that she is not able to type for any significant amount of time. Plaintiff has not returned to Dr. Watson for any further treatment since July 25, 2000.
10. On July 26, 2000, plaintiff returned to see Dr. Livingston and presented with complaints of tenderness and soreness to the top of her head. Plaintiff reported to Dr. Livingston that this condition had been ongoing for the past month. Dr. Livingston's July 26, 2000 medical notes do not reveal that plaintiff complained at all about any problems with her right hand, wrist, or arm. Plaintiff has not returned to Dr. Livingston for any further treatment since July 26, 2000.
11. There were no medical depositions taken in this matter of any physicians who had treated plaintiff since March 9, 2000.
12. The stipulated medical evidence in this matter does not support a showing that plaintiff's employment with defendant-employer, as a slotter, caused or significantly contributed to her development of her right hand and wrist tendonitis.
13. There is no medical evidence, or any other evidence, which shows that plaintiff's employment with defendant-employer placed her at an increased risk of developing right hand and wrist tendonitis than members of the public not so employed. Indeed, there is no evidence regarding increased risk.
14. Plaintiff has failed to prove that she suffers from an occupational disease caused by her job duties with defendant-employer and has failed to prove those job duties placed her at an increased risk of developing right hand and wrist tendonitis than members of the public not so employed.
15. Plaintiff does not have an occupational disease.
16. During the time that plaintiff was out of work on her leave of absence from defendant-employer, she received $274.92 per week. This leave of absence policy plan was provided by defendant-employer to plaintiff with her employment. The benefits from this plan were received by plaintiff for six months, effective from April 6, 2000 to the last payment of October 3, 2000.
17. During the six months that plaintiff was out of work on leave of absence from defendant-employer, she made minimal to no efforts to find any other employment.
18. Plaintiff returned to work full-time with Food Lion, as office assistant, on November 19, 2000.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The condition at issue in this case is not an enumerated occupational disease under N.C.G.S. § 97-53. Accordingly, in order to qualify as a compensable occupation disease it must be shown that the disease meets the standard set forth in N.C.G.S. § 97-53(13). In order for a disease, to constitute a compensable occupational disease under the statute, the condition must be due to causes and conditions characteristic of and peculiar to a particular trade or occupation or employment involved, but excluding all ordinary diseases of life to which the general public is equally exposed outside the employment. N.C.G.S. § 97-53(13).
2. Plaintiff has not met her burden of showing that her employment with defendant-employer caused or significantly contributed to the development of her right hand and wrist tendonitis. Thus plaintiff has failed to prove that she contracted a compensable occupational disease under the North Carolina Workers' Compensation Act during her employment with the defendant-employer. N.C.G.S. § 97-53(13).
3. In addition, plaintiff has failed to prove that her job duties, as a slotter, with defendant-employer placed her at an increased risk of developing right hand and wrist tendonitis than members of the public not so employed. N.C.G.S. § 97-53(13).
4. Plaintiff does not have an occupational disease.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim must be, and the same is hereby DENIED.
2. Each party shall bear its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER